10651, 10652.    WILLIAMS *et al.,* admr's, *v.* WESTERN &
ATLANTIC RAILROAD CO.; and *vice versa.*

1. Questions as to diligence and negligence, including contributory negligence, are questions peculiarly for the jury, and there being sufficient evidence in this case from which the jury might infer acts of negligence on the part of the defendant such as constituted the proximate cause of the injury, the court erred in granting a nonsuit. *White* v. *Atlanta Consolidated Street Ry. Co.,* 92 *Ga.* 494 (17 S. E. 672); *Carey* v. *East Tenn. &c. Ry. Co.,* 95 *Ga.* 747 (22 S. E. 299); *International Cotton Mills* v. *Webb,* 22 *Ga. App.* 309 (96 S. E. 16); *Moore* v. *Dixie Fire Ins. Co.,* 19 *Ga. App.* 800, 804 (92 S. E. 302). In view of the new and additional facts and circumstances disclosed by the evidence adduced upon the trial of the case now under review, the decision rendered by this court in *Williams* v. *Western & Atlantic R. Co.,* 20 *Ga. App.* 726 (93 S. E. 555), affirming the grant of a nonsuit in an action between the same parties and involving the same subject-matter as the one now before this court, is not controlling.

2. "A cause of action to recover damages for death under the Federal employer's liability act [U. S. Comp. St. §§ 8157-8665] accrues when an administrator is appointed, and not at the time of death, within the meaning of the section providing that no action shall be maintained

unless commenced within two years from the day the cause of action accrued."

3. The petition, as amended, was not subject to the demurrers interposed.

DECIDED FEBRUARY 9, 1920.

Action for damages; from city court of Atlanta—Judge Reid. March 27, 1919.

Application for certiorari was denied by the Supreme Court.

This is a suit under the Federal employer's liability act, instituted by Mrs. Jennie L. Williams, administratrix, and C. L. Williams, administrator, of the estate of Chester A. Williams, deceased, against the Western & Atlantic Railroad Company, to recover for the homicide of the decedent (the son of the plaintiffs), which occurred while he was in the employ of the defendant and in the discharge of his duties, his death having been occasioned by the wrecking of a building, brought about by the alleged explosion of escaping gas from a gasoline engine belonging to the defendant. The explosion and the decedent's death occurred on January 25, 1912. The suit was filed more than two years thereafter (January 24, 1917), but within two years after the appointment of the plaintiffs (September 29, 1915) as representatives of the decedent's estate. The petition was demurred to, on the ground that the suit was barred, since it is provided in the act under which the action arose that "No action shall be maintained under this act unless commenced within two years from the day the cause of action accrued." The demurrer was overruled and the defendant filed exceptions pendente lite. The case proceeded to trial and resulted in a nonsuit. The plaintiff in the main bill of exceptions excepts to the granting of a nonsuit, while the defendant, in a cross-bill of exceptions, excepts to the overruling of its demurrer, both general and special.

*Westmoreland, Anderson & Smith,* for plaintiffs.

*Tye, Peeples & Tye,* for defendant.

PER CURIAM. (After stating the foregoing facts.)

1. The judgment rendered by this court in 20 *Ga. App.* 726 (93 S. E. 555), affirming the grant of a nonsuit, was a suit between the same parties and upon the same subject-matter as the one now before us brought under the Federal employer's liability act. We do not consider that the former decision is now controlling upon the question whether or not there was an issue of fact as to the defendant's negligence as constituting the proximate cause

of the injury, which should have been submitted to the jury, since the new and additional evidence submitted by the plaintiffs in this, the present suit, very materially strengthens the contention of the plaintiffs that the explosion was caused by gasoline alleged to have escaped from the engine and pipes of the defendant. D. G. Hicks (or Hix), a witness for the plaintiff, testified at both of the trials, in part substantially as follows: The engine-room was not provided with ventilators. There were three windows in the engine-room. Those windows were kept closed in cool weather. There was nothing in the engine-room to cause an explosion in case somebody went into that room with a lighted lantern, except the gasoline. If that engine had been running for several hours and the room closed up, and there was gasoline leaking into the room, the heat caused by the motion of the wheels would be sufficient to volatilize that gasoline and cause an explosion when it came in contact with flame. I have never heard of anything else except a flame that would cause gasoline to be exploded. If the room had been closed up for several hours, and the engine was running, and there was leaking gasoline in the room, and the door opened and a party entered with a lighted lamp, with a flame, that air that was let in would be sufficient to volatilize that gasoline and cause an explosion.

Another expert witness, C. E. Freeman, testified at both of the trials, in part, substantially as follows: If there was a room fifteen by eighteen feet with a ceiling anywhere from twelve to eighteen feet high, built of brick with a cement floor (such as in this case), with two Fairbanks-Morse gasoline engines in it, with windows in the room, and the windows closed, and the door closed, and a party entered that room with a lighted lantern, and after the door was opened there was an explosion which wrecked that building and caught that party under the debris, there is only one form of gas that would enter this building, it is evident that a light would cause this explosion only from coming in contact with a gas, if those were gasoline engines, there was gasoline coming in the building; gas will not explode until it volatilizes, which it will do at any temperature from zero up; this explosion could only have been caused from the volatilization of some amount of gasoline that could have gotten into this building somehow being exploded or ignited from this lantern. If the engine had been running three

or four hours, and the gasoline had been leaking,  .  .  if this engine was running three or four hours in a room of the dimensions given, I would say it would raise the temperature of that room to from eighty to ninety degrees, and that would cause the gasoline to volatilize very rapidly.  If the door was opened and a party went in from the outside, and had gone from four to six feet, and an explosion took place from the lantern that he carried in his hand, the opening of the door and the letting in of the air would volatilize the gasoline sufficiently to cause the explosion.  If the temperature was from eighty to ninety degrees, and gasoline leaking or dropping one drop a second, it would take from three to six hours for that room to become sufficiently charged with gas to cause an explosion of sufficient violence to wreck the building.  The volatilization that would ordinarily take place would not be in sufficient quantities to be dangerous in the absence of a leak in some gasoline pipe or pump, in any standard-make gasoline engine that I have ever had any experience with.

Besides the evidence adduced on the former trial, the following additional evidence was submitted on the trial of the case now before us.  G. F. Pflasterfer, an employee of the defendant, sworn in behalf of plaintiff, testified:  "After an investigation I ascertained the cause of the blowing up and made a report on it; as well as I remember I made the report to my superior officer  .  . It [the explosion] was caused by the house being closed up for a considerable period, making it air-tight, and in the escaping gases from the engine accumulating there and having no chance to mix with the air, and that when a lighted lantern was taken into the compartment and the fresh air was let into the room, the proper mixture of gas with the air and the lighted lantern caused the explosion.  .  .  The cause of the explosion was gasoline having impregnated the room, the windows down, some one opened the door with a lighted lantern, a flame, and the building blew up. .  .  This examination was made within twenty-four hours after the accident.  .  .  I base it [the statement that the windows were shut] on the reports made to me as to the condition in which the power-house was left for three hours or more; the chief maintainer and others made that report, made the report that the engine was left running and the windows and doors down and shut."  It will be recalled that in the former decision this court

48

based its holding partly upon the fact that there was then nothing to indicate that the ventilating windows were closed.

C. L. Williams, who qualified as an expert on gasoline engines, testified with reference to the pump on the engine which was running the night of the explosion, as follows: "This pump on No.1 engine, the knoll-nut was very badly scarred, showing marks of violence caused by a chisel or something used on the knoll-nut to tighten it. . . The knoll-nut presses down on it, pressing the packing down like that. If this knoll-nut is screwed down all the way against the shoulder, the nut and shoulder would be in contact, leaving no space for the packing between the nut and the shoulder. . . *There were places indicating marks where oil had been deposited on the nut down on the barrel of the pump where the gasoline running down on the side of the pump left marks when it cut the oil. Gasoline will remove oil, and it left a streak showing that the pump had been leaking. . . In my opinion that condition had existed for some time, had been in that condition for some time. . . The gasoline that I speak of as being on the side of the pump could not have got there any other way except the way I have described.* . . This knoll-nut that I examined was on engine No. 1. It looked like somebody had used a chisel in order to make it fit tight. It did fit tight. If it did fit tight, gasoline could come between the plunger and the barrel, as there was no packing there, nothing to seal it. There was no packing there to seal the joint, and therefore the gasoline could come through there. It would come out from the barrel of the gasoline pump." The italicised portion of the evidence was not submitted at the former trial. There is no evidence going in any way to show that this particular leak in the pump, here testified to for the first time, had ever been remedied, or in any way sought to be remedied. D. G. Hicks, who qualified as an expert gasoline-engine man, testified for the first time at the second trial that without proper packing in the gasoline pump, and with the knoll-nut in the condition described by the witness Williams, gasoline would leak therefrom.

It will thus be seen that on *this* trial, but not at the former trial, there was evidence showing that the windows were *down and the door closed,* and new circumstances were adduced for the purpose of showing that gas was leaking from the *pump on the engine,*

as well as from the pipes. Furthermore, the witness Read, in addition to his testimony at the former trial, now swears that two or three of the threads on the gasoline *pipe* had *"worked out,"* and Misenheimer, who was not sworn on the former trial, testified that in reparing the leak in the *pipe,* he did not think that he "turned it over a quarter around." It would thus seem from all of the testimony submitted on the present suit (that is, the evidence which was new, taken in connection with the evidence which was also presented in the former cases and which was in substance repeated) that a jury might have been reasonably authorized to infer that the plaintiff had established by sufficient proof the fact that negligence on the part of the defendant did exist, and that such negligence constituted the proximate cause of the injury. Not only was evidence submitted for the first time for the purpose of showing that the ventilating windows of the room were closed, but new evidence was submitted for the purpose of showing a new and independent leak, the evidence being not only to the effect that gasoline might have leaked from such new source,—the pump on the engine,—but that it was actually doing so. Even in regard to the alleged leak in the pipe, while the same evidence appears now as at the former trial, tending to show that such admitted defective joint had been remedied, still in this case there is now evidence to the effect that certain threads on this pipe had worked out, and the jury on the last trial, had they been permitted to do so, could have weighed and considered for themselves the nature and character of the work done in the repairing of such leaking and defective pipe by the defendant's mechanic, since on the last trial it was testified by the mechanic for the first time, "I don't think I turned it over a quarter around." he then having reference to the same joint that had as many as two or three of its threads worked out. In our opinion the evidence is entirely sufficient to have authorized the submission to the jury of the question of the defendant's negligence, made by all of this testimony, irrespective as to any issue as to contributory negligence on the part of the decedent, and that the court erred in refusing to permit the jury to pass upon this question, by granting a nonsuit.

2. The case being reversed on the main bill of exceptions, it becomes necessary to pass upon the cross-bill of exceptions, wherein the defendant excepts to the overruling of its demurrer, both gen-

eral and special, insisting that the plaintiffs' suit is barred by reason of not having been "commenced within two years from the date the cause of action accrued," as the act requires. The defendant insists that the cause of action accrued on the decedent's death, which occurred on January 25, 1912, and that, as the suit was not commenced until January 24, 1917, more than two years thereafter, it is therefore barred. On the contrary the plaintiff insists that the cause of action accrued on the appointment of the plaintiffs as representatives of the estate of the deceased, which appointment was made on September 28, 1915, and the suit, having been commenced within two years from that date, is not barred. The authorities are conflicting on the question as to when a cause of action under this act accrues. Some hold that the right accrues upon the appointment of an administrator of the estate of the person for whose homicide a suit is brought, while others hold that it accrues upon the death of the decedent. The weight of authority seems to support the view that the cause of action accures with the appointment of the administrator. Without attempting any lengthy discussion or elaboration of the authorities pro and con, we are content to rest our decision on the authority of the recent well considered and exhaustively treated case of American R. Co. of Porto Rico *v.* Coronas, decided by the United States Circuit Court of Appeals, First Circuit, 230 Fed. 545 (144 C. C. A. 599, L. R. A. (N. S.) 1916 E, 1095). It was there held, that a cause of action to recover damages for death under the Federal employer's liability act accrues when an administrator is appointed, and not at the time of death, within the meaning of the section providing that no action shall be maintained unless commenced within two years from the day the cause of action accrued. We adopt the conclusion reached in that case, and hold that the cause of action in this case accrued with the appointment of the administrators.

The petition was not subject to general demurrer, and, as finally amended, was not subject to any of the grounds of the special demurrer.

*Judgment reversed on the main bill of exceptions; affirmed on cross-bill. Jenkins, P. J., and Stephens, J., concur.*

SMITH, J., dissenting. The majority of the court are of the opinion that the trial judge erred in granting a nonsuit, and that

therefore the case should be reversed on the main bill of exceptions. I cannot concur with my colleagues in this judgment. I am of the opinion that the action of the court in granting a nonsuit was proper, for the following reasons: When this case was previously here for review the evidence was thoroughly studied and considered, and the following ruling made: "That the cause of action, if any, arises under the Federal employer's liability act, and under the petition as filed 'the case pleaded was not proven and the case proven was not pleaded,' and the court properly granted the nonsuit." *Williams* v. *W. A. Railroad Co.*, 20 *Ga. App.* 726, 729 (93 S. E. 555, 556). On motion for rehearing this court held that the doctrine of res ipsa loquitur did not apply, and quoted with approval the following: "Negligence cannot be inferred merely from the fact of disaster; the burden being on plaintiff to establish by proof that negligence did exist. . . A case may not be submitted to the jury where there is at most only a balanced probability that actionable negligence existed. . . Manifestly a presumption of negligence does not arise upon mere evidence of an injury sustained. . . The maxim res ipsa loquitur does not apply where the accident might have been due to improper handling as well as to improper furnishing the thing causing the accident." Ib. 730, 731, 732.

The record now before us in this case discloses that although there was an effort made to add to the testimony introduced on the former trial and to introduce new features into the case, the evidence is substantially the same as it was when this court made the ruling above referred to. No material changes have been made in the case as a whole, and though two new witnesses were introduced, their testimony at most does not amount to more than suggestions or inferences as to possibilities. It is my opinion, therefore, that since there is no material or substantial change in the record now under review and the record reviewed by this court when this case was previously before it, the rulings then made are controlling.

It is unnecessary, under the view I take of the case, to pass upon the questions raised by the cross-bill of exceptions.